Julia S. Acken - 021646
jacken@jsslaw.com
John J. Balitis - 011801
jbalitis@jsslaw.com
**JENNINGS, STROUSS & SALMON, P.L.C.**
A Professional Limited Liability Company
One East Washington Street
Suite 1900
Phoenix, Arizona 85004-2554
Telephone: (602) 262-5911

Attorneys for Plaintiff Barton & Associates, Inc.

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Barton & Associates, Inc., a Delaware corporation, <br><br> Plaintiff <br><br> vs. <br><br> Jamie Trainor; Andre Godbout; Kendall Guaglianone; and AB Staffing Solutions, LLC, an Arizona limited liability company, <br><br> Defendants | No. <br><br> **COMPLAINT AND JURY TRIAL DEMAND** |

## **INTRODUCTION**

1.     This is an action for breach of contract, including the confidentiality and return of documents covenants contained in the Confidentiality, Restrictive Covenants and Proprietary Rights Agreements ("Employment Agreements" or "Agreements") of Jamie Trainor ("Trainor"), Andre Godbout ("Godbout"), and Kendall Guaglianone ("Guaglianone"), former employees of Plaintiff Barton & Associates, Inc. ("Barton"), and for misappropriation of Barton confidential and proprietary information and trade secrets which took years to develop.  Barton alleges that the defendants knowingly obtained, used and disclosed internal and confidential Barton documents and information for the benefit of a competitor, AB Staffing Solutions, LLC ("AB Staffing") and caused harm to Barton.  Moreover, AB Staffing has used Barton confidential and/or proprietary

information in order to actively compete with Barton.

2.     Barton's claims against Trainor, Godbout, and Guaglianone, (referred to collectively herein as the "Employee Defendants") and AB Staffing (Employee Defendants and AB Staffing shall be referred to collectively herein as "Defendants") include claims for equitable relief and damages arising out of the breaches of their Employment Agreements with Barton.  Barton seeks damages and injunctive relief to prohibit Defendants from causing irreparable harm to Barton's business as well as the immediate return of all Barton confidential and/or proprietary information, as defined in the Barton Employment Agreements (attached hereto as *Exhibits A-C*).

## I.     PARTIES

3.     Plaintiff Barton & Associates, Inc. is a Delaware corporation duly authorized to transact business throughout the state of Arizona, with an office located at 1050 W Washington St #101, Tempe, Arizona.

4.     Upon information and belief, Defendant Jamie Trainor is an individual residing at 21150 N. Tatum Blvd, Apartment 3056 Phoenix, Arizona.

5.     Upon information and belief Defendant Andre Godbout is an individual residing at 2916 E Nisbet Ct, Phoenix, Arizona.

6.     Upon information and belief Defendant Kendall Guaglianone is an individual residing at 1012 West 10th Street, Tempe, Arizona.

7.     Upon information and belief, Defendant AB Staffing Solutions, LLC is an Arizona limited liability company, with a registered office at 3451 S. Mercy Rd, Suite 102, Gilbert, Arizona. The Manager and Member of AB Staffing Solutions, LLC are both listed at this address in Gilbert, Arizona.

## II.     JURISDICTION AND VENUE

8.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) inasmuch as AB Staffing has a usual place of business located in Arizona, the three Employee Defendants reside in Arizona, the matter at issue involves damages exclusive of interest and costs well in excess of the diversity threshold, and there is complete

2

diversity between the parties as Barton is an out-of-state Delaware corporation with a principal place of business in the Commonwealth of Massachusetts.

9.     Venue is proper in this Court pursuant to 28 U.S.C.§ 1391(b)(1) as the Employee Defendants reside and work in Arizona and AB Staffing Solutions LLC does business in Arizona and its Manager and Member of AB Staffing Solutions LLC are identified in public filings with the Arizona Secretary of State as being in Gilbert, Arizona.

10.     Although Defendants Trainor and Godbout contractually consented to the application of Massachusetts law in deciding their disputes with Barton pursuant to the terms of their Barton Employment Agreements (*see Exhibits A & B*), each of the Employee Defendants reside in Arizona, and the claims against AB Staffing will involve litigation in Arizona as AB Staffing is an Arizona company with a principal place of business in Maricopa County, Arizona.  Thus, it is in the interest of judicial economy to have this matter heard in one forum.

### III.     FACTS

**A.     Barton's Business**

11.     Barton is a *locum tenens*[1] recruiting and staffing firm that recruits specialized medical professionals ("Provider" or "Providers") to fill temporary positions for medical facilities and other organizations across the country ("Clients").

12.     Barton identifies openings at its Clients' facilities and coordinates the placement of Providers to fill such openings to provide both onsite and remote (telemedicine) services in the areas of primary care, surgery, hospitalists, and psychiatry, among other specialties.

13.     Two significant areas of Barton's operations involve recruiting and account management.

---

[1] *Locum tenens* is a Latin phrase that means "to hold the place of" and is used in the industry to describe the business of temporary staffing of physicians and other medical practitioners. Practitioners working as *locum tenens* providers temporarily provide medical services to a facility that is short staffed or otherwise in need of temporary medical services.

14.     Employees who work in recruiting ("Recruiters") are responsible for identifying and building relationships with Providers who are interested in serving in *locum tenens* positions.

15.     Employees on the account management side ("Account Managers") are responsible for working with prospective and existing Clients seeking Providers to fill *locum tenens* positions.

16.     Barton's Account Managers are responsible for sourcing, establishing relationships with, and coordinating the placement of Providers with prospective and existing Clients throughout the nation, which requires without limitation, understanding the Client's preferences, determining their staffing and other special needs, identifying key contacts, and negotiating contracts and fees.  Openings for Providers are not typically advertised publicly or through human resources, and a sizeable and growing portion of Barton's business includes the supply of Providers to fill openings with businesses who seek to provide onsite or remote clinical services to their employees.  As such, Barton keeps confidential its lists and related information on all Clients.  Barton spends substantial time and expense training Account Managers on how to identify and develop business relationships with Clients, as well as substantial monies recruiting these valuable assets.

17.     It is incredibly difficult to locate Providers that meet the necessary qualifications – such as licensure, skill set, and history – in order to be placed at Client locations.  As such, Barton devotes significant resources and training to its Recruiters in order to locate Providers and maintain ongoing relationships with Providers.

18.     In order to place Providers with Clients, Barton obtains Providers' curricula vitae ("CV") and spends a significant amount of time and resources learning their licensure histories, preferences, and availabilities.  Information related to Barton's Providers is maintained in a secure database, kept confidential, and given to its Recruiters and Account Managers.  Barton spends substantial time and expense training its Recruiters on how to identify and recruit Providers, as well as substantial monies

4

1    recruiting these valuable assets.

2         19.    Barton fills all of its Clients' open positions by painstakingly identifying

3    and developing consultative relationships with both Clients and Providers.

4         20.    Barton has generated a substantial amount of goodwill by building,

5    cultivating, supporting, and maintaining relationships between its Recruiters and its

6    Providers, on the one hand, and between its Account Managers and its Clients, on the

7    other hand.   The goodwill is enhanced and further developed by Barton's marketing,

8    training, and support.

9         21.    Barton has also painstakingly developed internal contracts, marketing

10   materials and strategies, to assist Barton in remaining competitive and expanding its

11   business.

12        22.    In order to protect this valuable information, concerning Barton's

13   Providers, Clients, and business operations, and for good and valuable consideration,

14   Barton requires each of its Recruiters, Account Managers, Senior Managers, and all other

15   employees to sign a Confidentiality, Restrictive Covenants, and Proprietary Rights

16   Agreement.  All offers of employment made to any Barton applicants are conditioned

17   upon their signing such an agreement.

18        23.    In addition to these agreements, Barton takes steps to safeguard its

19   confidential and/or proprietary information.  These precautions include limiting access to

20   its internal confidential information to third parties, limiting access to its lists of

21   Providers and Clients, using appropriate locks and badges, and having password

22   protected computers and databases.

23   **B.    <u>Trainor's Employment with Barton</u>**

24        24.    Trainor became employed by Barton on January 11, 2016 and his last day

25   of work was on June 27, 2019.

26        25.    Prior to working for Barton, Trainor did not have any experience in the

27   *locum tenens* industry and as such Barton provided him with substantial training.

28        26.    For the relevant time period, Trainor worked out of Barton's Tempe,

5

Arizona office.

27.     Throughout the entirety of his employment at Barton, Trainor's primary focus was on recruiting, i.e., locating and building relationships with Providers in order to place them at Barton's Clients.

28.     Indeed, a large portion of Trainor's compensation was incentive compensation based upon Providers who were placed on assignment, and the majority of his time was to be devoted to engaging with Providers and assisting with placing them on assignment.

29.     As a condition of employment, and in order to gain access to Barton's Providers and Clients and other confidential and/or proprietary information, Trainor was required to sign agreements containing confidentiality provisions and which obligated him to return all Barton materials, information and documents to Barton upon the termination of his employment.   A copy of his most recent Barton Employment Agreement is attached hereto as *Exhibit A*.

30.     Trainor resigned from Barton, and his last day of work was on June 27, 2019.

31.     On his last day of work, Barton reminded Trainor of his ongoing restrictions.  A copy of the letter reminding him of his obligations is attached hereto as *Exhibit D.*

C.     **Godbout's Employment**

32.     Godbout became employed by Barton on April 28, 2014, and his last day of work was on April 2, 2020.

33.     Prior to working for Barton, Godbout did not have any experience in the *locum tenens* industry and as such Barton provided him with substantial training.

34.     For the relevant time period, Godbout worked out of Barton's Tempe, Arizona office.

35.     Throughout the entirety of his employment at Barton, Godbout's primary focus was on the account management side, i.e., he located and engaged with Barton's

6

Clients.

36.    Indeed, a large portion of Godbout's compensation was incentive compensation based upon assignments with Clients and the majority of his time was to be devoted to such sales.

37.    As a condition of employment, and in order to gain access to Barton's Providers and Clients and other confidential and/or proprietary information, Godbout was required to sign agreements containing confidentiality provisions and which obligated him to return all Barton materials, information and documents to Barton upon the termination of his employment.   A copy of his most recent Employment Agreement is attached hereto as *Exhibit B*.

38.    Godbout resigned from Barton and his last day was April 2, 2020.

39.    Prior to his departure, Godbout also forwarded himself a copy of a Barton Employment Agreement.

40.    In addition, Barton reminded Godbout of his ongoing restrictions.  A copy of the letter reminding him of his obligations is attached hereto as *Exhibit E.*

**D.    Guaglianone's Employment**

41.    Guaglianone was employed at Barton from July 30, 2018 until June 25, 2020.

42.    Prior to working for Barton, Guaglianone did not have any experience in the *locum tenens* industry and as such Barton provided him with substantial training.

43.    For the relevant time period, Guaglianone worked out of Barton's Tempe, Arizona office.

44.    Throughout the entirety of his employment at Barton, Guaglianone's primary focus was on recruiting, i.e., locating and building relationships with Providers in order to place them at Barton's Clients.

45.    Indeed, a large portion of Guaglianone's compensation was incentive compensation based upon Providers who were placed on assignment and the majority of his time was to be devoted to placing Providers on assignment.

7

46.     As a condition of employment, and in order to gain access to Barton's Providers and Clients and other confidential and/or proprietary information, Guaglianone was required to sign agreements containing confidentiality provisions and which obligated him to return all Barton materials, information and documents to Barton upon the termination of his employment.   A copy of his most recent Employment Agreement is attached hereto as *Exhibit C*.

47.     Guaglianone resigned from Barton and his last day was on June 25, 2020.

48.     On his last day of work, Barton reminded Guaglianone of his ongoing restrictions.  A copy of the letter reminding him of his obligations is attached hereto as *Exhibit F*.

**E.     Barton Employment Agreements**

49.     The Barton Employment Agreements specifically required each of the Employee Defendants to acknowledge and agree, among other things, that: (a) Barton has confidential and proprietary information relating to Barton's business, including Barton's Clients and Providers; (b) they shall maintain the confidentiality of that information; and (c) they shall return all property belonging to Barton and all materials and documents concerning Barton upon termination of their employment.

50.     The Barton Employment Agreements, in pertinent part, provide:

1.     Confidentiality and Security

(a)     Confidential Information.

* * *

The Employee further understands, acknowledges, and agrees that the Confidential Information and the Employer's ability to reserve it for the exclusive knowledge and use of the Employer Group is of great competitive importance and commercial value to the Employer, and that improper use or disclosure of the Confidential Information by the Employee will cause irreparable harm to the Employer Group, for which remedies at law will not be adequate and may also cause the Employer to incur significant financial costs and loss of business advantages.

Confidential Information includes but is not limited to all information that is proprietary, sensitive, secret, or not generally known to the public, in spoken, printed, electronic, or any other form

8

or medium, relating directly or indirectly to: business processes, practices, methods, policies, plans, publications, documents, research, operations, services, strategies, techniques, agreements, contracts, terms of agreements, transactions, potential transactions, negotiations, pending negotiations, know-how, trade secrets, computer programs, computer software, applications, operating systems, software design, web design, work-in-process, databases and database information (including without limitation customer lists, Client lists, Provider lists, contractor lists, and all associated and related information and documentation), manuals, records, articles, systems, material, sources of material, financial information, accounting information, accounting records, legal information, marketing information, advertising information, pricing information, credit information, design information, payroll information, staffing information, personnel information, employee lists, supplier lists and information, vendor lists and information, developments, reports, internal controls, security procedures, graphics, drawings, sketches, market studies, sales information, revenue, profits and losses, debts, costs, notes, communications, algorithms, product plans, designs, styles, models, ideas, audiovisual programs, inventions, unpublished patent applications, original works of authorship, discoveries, experimental processes, experimental results, and specifications of the Employer Group or its businesses or any existing Clients or Prospective Clients, Providers, contractors, or investors and other associated third parties, or of any other person or entity that has entrusted information to the Employer in confidence.

The Employee understands that the above list is not exhaustive, and that Confidential Information also includes other information that is marked or otherwise identified as confidential or proprietary, or that would otherwise appear to a reasonable person to be confidential or proprietary in the context and circumstances in which the information is known or used.

The Employee understands and agrees that any Confidential Information developed by the Employee in the course of the Employee's employment by the Employer shall be subject to the terms and conditions of this Agreement as if the Employer furnished the same Confidential Information to the Employee in the first instance. Confidential Information shall not include information that is generally available to and known by the public, <u>provided</u> that such disclosure to the public is through no direct or indirect fault of the Employee or person(s) acting on the Employee's behalf.

* * *

(c)     Disclosure and Use Restrictions.     The Employee agrees and covenants: (i) to treat all Confidential Information as strictly confidential; (ii) not to directly or indirectly disclose, publish, communicate, or make available Confidential Information, or allow it to be disclosed, published, communicated, or made available, in

9

whole or part, to any third party not having a need to know and authority to know and use the Confidential Information in connection with the business of the Employer Group and, in any event, not to anyone outside of the direct employ of the Employer Group except as required in the performance of the Employee's authorized employment duties to the Employer or with the prior written consent of an authorized officer acting on behalf of the Employer in each instance (and then, such disclosure shall be made only within the limits and to the extent of such duties or consent); and (iii) not to access or use any Confidential Information, not to copy any documents, records, files, media, or other resources containing any Confidential Information, and not to remove any such documents, records, files, media, or other resources from the premises or control of the Employer, except as required in the performance of the Employee's authorized employment duties to the Employer or with the prior written consent of an authorized officer acting on behalf of the Employer in each instance (and then, such disclosure shall be made only within the limits and to the extent of such duties or consent). Nothing herein shall be construed to prevent disclosure of Confidential Information as may be required by applicable law or regulation, or pursuant to the valid order of a court of competent jurisdiction or an authorized government agency, <u>provided</u> that the disclosure does not exceed the extent of disclosure required by such law, regulation, or order. The Employee shall provide written notice of any such order to an authorized officer of the Employer within twenty-four (24) hours of receiving such order, but in any event sufficiently in advance of making any disclosure to permit the Employer to contest the order or to seek confidentiality protections, as determined in the Employer's sole discretion. In addition, this Section does not in any way restrict or impede the Employee from exercising Employee's rights under Section 7 of the National Labor Relations Act, or from otherwise disclosing information as permitted by law.

* * *

3.    <u>Proprietary Rights.</u>

(a) <u>Work Product</u>. The Employee acknowledges and agrees that all writings, works of authorship, technology, inventions, discoveries, ideas, and other work product of any nature whatsoever, that are created, prepared, produced, authored, edited, amended, conceived, or reduced to practice by the Employee individually or jointly with others during the period of Employee's employment by the Employer and relating in any way to the business or contemplated business, research, or development of the Employer Group (regardless of when or where the Work Product is prepared or whose equipment or other resources is used in preparing the same) and all printed, physical, and electronic copies, all improvements, rights, and claims related to the foregoing, and other tangible embodiments thereof (collectively, "**Work Product**"), as well as any and all rights

7225471v1(88888.920)

in and to copyrights, trade secrets (including without limitation all databases and information contained therein), trademarks (and related goodwill), patents, and other intellectual property rights therein arising in any jurisdiction throughout the world and all related rights of priority under international conventions with respect thereto, including all pending and future applications and registrations therefor, and continuations, divisions, continuations-in-part, reissues, extensions, and renewals thereof (collectively, "**Intellectual Property Rights**"), shall be the sole and exclusive property of the Employer.

For purposes of this Agreement, Work Product includes, but is not limited to, Employer Group information, including plans, publications, research, strategies, techniques, agreements, documents, contracts, terms of agreements, negotiations, know-how, computer programs, computer applications, software design, web design, work in process, databases and database contents and information, manuals, results, developments, reports, graphics, drawings, sketches, market studies, notes, communications, algorithms, product plans, product designs, styles, models, audiovisual programs, inventions, unpublished patent applications, original works of authorship, discoveries, experimental processes, experimental results, specifications, customer information, Client information and lists, Prospective Client information and lists, Provider information and lists, customer information and lists, marketing information, technology information, advertising information, training instructions and information (including training presentations and materials), and sales information.

\* \* \*

4.   Security

(b)   Exit Obligations. Upon (i) voluntary or involuntary termination of the Employee's employment or (ii) the Employer's request at any time during the Employee's employment, the Employee shall: (a) provide or return to the Employer any and all Employer Group property, including without limitation keys, key cards, access cards, identification cards, security devices, employer credit cards, network access devices, computers, cell phones, smartphones, PDAs, pagers, fax machines, equipment, speakers, webcams, manuals, reports, files, books, compilations, work product, e-mail messages, recordings, tapes, disks, thumb drives or other removable information storage devices, hard drives, data, and all Employer Group documents and materials belonging to the Employer and stored in any fashion, including but not limited to those that constitute or contain any Confidential Information or Work Product, that are in the possession or control of the Employee, whether they were provided to the Employee by the Employer Group or any of its business partners or associates or created by the Employee in connection with the Employee's employment by the

11

> Employer; and (b) delete or destroy all copies of any such documents and materials not returned to the Employer that remain in the Employee's possession or control, including those stored on any non-Employer Group devices, networks, storage locations, and media in the Employee's possession or control.

*See **Exhibits A & B**, ¶¶ 1(a), 1(c), 3(a), & 4(b); see also* language applicable to Guaglianone's Barton Employment Agreement at ***Exhibit C***, ¶¶ 2(a), 2(b), 4(a), & 5(b).

51. The Employee Defendants further agreed that Barton would be entitled to injunctive and other equitable relief in the event that they breached their respective agreements with Barton. The Barton Employment Agreement states in pertinent part:

> 8. <u>Remedies</u>. The Employee acknowledges that the Employer's Confidential Information and the Employer's ability to reserve it for the exclusive knowledge and use of the Employer is of great competitive importance and commercial value to the Employer, and that improper use or disclosure of the Confidential Information by the Employee will cause irreparable harm to the Employer Group, for which remedies at law would not be adequate. In the event of any breach or threatened breach by the Employee of any of the provisions of this Agreement, the Employee hereby consents and agrees that the Employer shall be entitled, in addition to other available remedies, to a temporary or permanent injunction or other equitable relief against such breach or threatened breach from any court of competent jurisdiction, without the necessity of showing any actual damages or that monetary damages would not afford an adequate remedy, and without the necessity of posting any bond or other security. The aforementioned equitable relief shall be in addition to, not in lieu of, legal remedies, monetary damages, or other available forms of relief. The Employee further acknowledges that each member of the Employer Group is an intended third-party beneficiary of this Agreement.

*See **Exhibits A & B**, ¶ 8; see also* language applicable to Guaglianone's Barton Employment Agreement at ***Exhibit C***, ¶ 8.

52. In addition, Defendants Trainor and Godbout consented to a choice of law clause. In paragraph 10 of their Barton Employment Agreements the Defendants Trainor and Godbout agreed that:

> This Agreement, for all purposes, shall be construed in accordance with the laws of Massachusetts without regard to conflicts-of-law principles. Any action or proceeding by either Party to enforce this

> Agreement shall be brought only in any state or federal court located in the Commonwealth of Massachusetts, county of Suffolk. The Parties hereby irrevocably submit to the exclusive jurisdiction of such courts and waive the defense of inconvenient forum to the maintenance of any such action or proceeding in such venue.

See ***Exhibits A & B***, ¶ 10.

53.     These provisions safeguarding Barton's proprietary and confidential information are crucial to Barton as during their respective employments the Employee Defendants had access to proprietary internal documents and information belonging to Barton and were in regular communications with Clients as well as Providers.

**F.     <u>Trainor Forwards to His Personal Email Over 40 Resumes Belonging to Barton's Providers in the Same Month in Which He Resigns from Barton.</u>**

54.     On June 27, 2019, Trainor resigned from Barton.

55.     Trainor informed his supervisor that he would be running a nursing division for AB Staffing.  Trainor's supervisor reminded Trainor of his ongoing obligations and directed him to speak to Barton's president.

56.     On or about March 6, 2020, as the Covid-19 pandemic was beginning in full force, Barton discovered that Trainor was competing in the *locum tenens* space on behalf of AB Staffing and had solicited several of the Providers he had placed while at Barton.

57.     Upon learning that Trainor had been contacting the same Providers he had worked with while employed at Barton, Barton engaged in an investigation into Trainor's activities prior to his departure from Barton.

58.     Barton discovered that in the weeks prior to his resignation from Barton, Trainor sent to a personal email account 42 résumés and/or CV's belonging to Barton Providers.

59.     Trainor was not permitted to take any Provider information, including but not limited to, these forwarded emails, résumés, and/or CVs.  Rather, he had an obligation to return such information.

13

60.     Moreover, Trainor also forwarded to himself a copy of a blank Barton Provider timesheet.  Trainor would have no need to forward a blank Provider timesheet if he was not planning on competing with Barton.

61.     Upon information and belief, Trainor has utilized information he improperly took from Barton in order to compete with Barton at his new employment with AB Staffing.

62.     Upon information and belief, AB Staffing, in hiring Trainor, was aware of his employment at Barton as well as his contractual obligations to Barton, which prohibited the misuse of Barton confidential and/or proprietary information and documents.

**G.     Godbout begins work for a competitor and solicits Barton's Clients.**

63.     Godbout resigned from his employment on April 2, 2020.

64.     On or about June 23, 2020, Barton became aware that Godbout had begun working in the *locum tenens* industry for AB Staffing.

65.     Specifically, Barton became aware that Godbout began targeting another of Barton's Account Managers' Clients and had made representations that Godbout had trained that Barton Account Manager.

66.     Godbout has specific knowledge regarding Barton's Clients, including, but not limited to, their staffing needs, preferences, and pricing information.

67.     As with Trainor, upon discovering Godbout's new employment, Barton conducted an investigation into Godbout's pre-resignation activities.

68.     Barton discovered that prior to his resignation Godbout forwarded to his personal email a copy of *MSP & VMS Selling around them During Covid-19,* a PDF which had been compiled by Barton and was labeled "Confidential & Proprietary."

69.     As evidenced by the Confidential & Proprietary" label, this document was intended for the exclusive use of Barton in order to compete in the *locum tenens* industry. This presentation took significant time for Barton to develop, and it was explained to Godbout that it contained incredibly valuable information about Barton's sales strategies.

14

70.     Godbout was not permitted to take this document and he was under an obligation to return all confidential and/or proprietary information belonging to Barton at the end of his employment.  It is also particularly troubling that Godbout's new employer, AB Staffing, is affiliated with an MSP and now is aware of Barton's sales strategies.

71.     Moreover, upon information and belief, on behalf of AB Staffing, Godbout has already placed a provider on assignment with a Barton Client.

72.     As such, Godbout is in violation of his Barton employment agreement.

73.     Upon information and belief, AB Staffing, in hiring Godbout, was aware of his employment at Barton as well as his contractual obligations to Barton, which prohibited the misuse of Barton confidential and/or proprietary information and documents.

**H.      Guaglianone joins a competitor immediately upon leaving.**

74.     Guaglianone resigned from his employment with Barton on June 25, 2020. Guaglianone informed Barton that he was going to work for an industrial staffing company and work with a close friend who used to work at Barton.

75.     On or about July 25, 2020, Barton learned that Guaglianone had joined Godbout and Trainor at AB Staffing.

76.     Following its discovery of the troubling actions of Trainor and Godbout downloading Barton materials to their personal email, Barton reviewed Guaglianone's pre-resignation activities.

77.     Barton learned that prior to his departure from Barton, Guaglianone emailed a Barton Provider curriculum vitae to his personal email and a blank Barton provider timesheet.   Guaglianone would have had no reason to email the Barton Provider's curriculum vitae and the blank Barton Provider timesheet, if he was going to work for an industrial staffing company.

78.     Upon information and belief, and having been previously made aware of Barton's employment agreement with Trainor, AB Staffing, in hiring Giaglianone, was aware of his employment agreement with Barton, including his contractual obligations to

15

Barton, which prohibited the misuse of Barton confidential and/or proprietary information and documents.

### IV.   CAUSES OF ACTION
### COUNT I

**Breach of Contract – Confidentiality and Return of Barton Property Provisions**
**(Against Employee Defendants)**

79.   Barton repeats and re-alleges the allegations in each of the foregoing paragraphs.

80.   Defendants Trainor, Godbout, and Guaglianone each entered into Barton Employment Agreements, in which they voluntarily agreed to confidentiality restrictions and agreed to return Barton documents and property upon the termination of their employment from Barton.

81.   Specifically, as to Trainor and Godbout, Barton brings claims of violations of Paragraphs 1 and 4 of their respective Barton Employment Agreements.

82.   Specifically as to Guaglianone, Barton brings claims of violations of Paragraphs 2 and 5 of his Barton Employment Agreement.

83.   By the actions described above, including retaining and using Barton confidential and/or proprietary information post-employment, and providing Barton confidential and/or proprietary information to aid a competitor, the Employee Defendants have breached the aforementioned covenants contained in their respective Barton Employment Agreements.

84.   The Employee Defendants' respective breaches of contract have caused Barton ongoing irreparable harm and other damages in an amount to be determined at trial and other injury, including misappropriation of Barton's confidential information and damage to Barton's goodwill.

85.   Based upon the Employee Defendants' breaches of contract detailed above, Barton is entitled to immediate, temporary and permanent injunctive relief, a return of their documents, and an award of all appropriate damages.

7225471v1(88888.920)

**COUNT II**

**Conversion**

**(Against Employee Defendants)**

86.     Barton repeats and re-alleges the allegations in each of the foregoing paragraphs.

87.     Barton had valid property rights in its confidential and/or proprietary information, including, but not limited to, its Provider résumés, Provider CVs, Provider information, Client information, Provider timesheets, and *MSP & VMS Selling around them During Covid-19* presentation.  Barton's confidential and/or proprietary information was for Barton's own exclusive use.

88.     The Employee Defendants wrongfully obtained and continue to possess Barton confidential and/or proprietary information and documents, including, but not limited to, its Provider résumés, Provider CVs, Provider information, Client information, Provider timesheets, and *MSP & VMS Selling around them During Covid-19* presentation.  Barton's confidential and/or proprietary information was for Barton's own exclusive use.

89.     The Employee Defendants were not authorized to take and/or maintain Barton confidential and/or proprietary documents or information and they were not authorized to use them to compete with Barton. and Defendants' use has seriously interfered with Barton's property rights.

90.     The Employee Defendants' misuse of Barton's confidential and/or proprietary information and documents occurred within the state of Arizona.

91.     As a result of the Employee Defendants' unauthorized use of Barton's confidential and/or proprietary information and documents has harmed Barton.

**COUNT III**

**Intentional Interference with Contractual Relations**

**(Against AB Staffing)**

92.     Barton repeats and re-alleges the allegations in each of the foregoing

17

paragraphs.

93.   Barton has valid contractual relationships with each of the Employee Defendants.

94.   Upon information and belief, Employee Defendants' new duties at AB Staffing are similar to the duties they held at Barton at the time of their respective resignations.

95.   Upon information and belief, prior to hiring the Employee Defendants, AB Staffing had knowledge of each of the Employee Defendants' contractual relationships and obligations to Barton regarding Barton's confidential and/or proprietary information and the return of such information.

96.   AB Staffing intentionally interfered with Barton's contractual relationships with each of the Employee Defendants and caused them to breach their respective contractual obligations which required the Employee Defendants to maintain the confidentiality of Barton's proprietary and/or confidential documents and return of Barton property.

97.   AB Staffing's conduct was improper as to motive or means and was done to gain an unfair advantage in the *locum tenens* industry and to unfairly compete with Barton.

98.   As a result of AB Staffing's interference, Barton has been harmed and suffered damages.

**<u>COUNT IV</u>**

**Unjust Enrichment**

**(Against AB Staffing)**

99.   Barton repeats and re-alleges the allegations in each of the foregoing paragraphs.

100.   Barton does not have a contractual relationship with AB Staffing.

101.   Defendants knew of the terms of the Barton Employment Agreements. Moreover, Defendants knew that Barton's Provider information, Client information, and

18

other confidential and/or proprietary business documents belonged to Barton and were essential to Barton's competitive advantage. Defendants knew that taking Barton's confidential and/or proprietary information would result in conferred benefits on AB Staffing.

102.    AB Staffing knowingly accepted those benefits despite their origin stemming from breaches of their respective Employment Agreements with Barton.

103.    AB Staffing's acceptance of the benefits under the circumstances was inequitable and unjust.

104.    Barton has been damaged by AB Staffing's unjust enrichment.

## V.    **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff prays that the Court:

A.      Enter judgment in favor of Barton and against Defendants on all counts;

B.      Award Barton compensatory damages, as appropriate, on each Count in an amount to be determined at trial, including but not limited to costs, expenses, and attorneys' fees;

C.      Enter a temporary and permanent injunction against the Employee Defendants and AB Staffing enjoining them from directly or indirectly using and/or disclosing any contracts, Client or Provider lists or other trade secrets or confidential and proprietary information of Barton acquired directly or indirectly by any means, including during their employment with and/or in rendering services to and/or on behalf of AB Staffing;

D.      Enjoin Employee Defendants and AB Staffing from directly or indirectly employing any former Barton employee in a manner inconsistent with their respective contractual relationships with Barton, including their confidentiality and return of documents provisions in their Barton Employment Agreements;

E.      Order Employee Defendants and AB Staffing to preserve, all electronic evidence, e-mails and attachments, of or relating to all Barton information and materials received by AB Staffing from any source, including at any personal or company e-mail

7225471v1(88888.920)

address, or otherwise taken, removed, obtained and/or procured from anyone, including without limitation any current and former Barton employees, and Barton Clients and/or Providers;

      F.    Enjoin Employee Defendants and AB Staffing from directly or indirectly making any further use of Barton's proprietary information, trade secrets, and/or confidential information, and require Employee Defendants and AB Staffing to return all such information forthwith and certify, under the penalties of perjury, to the Court and Barton that all such information has been so returned and will not directly or indirectly be used or accessed by Employee Defendants or AB Staffing;

      G.    Require Employee Defendants and AB Staffing to provide an accounting of all monies directly or indirectly earned and/or received from its illicit use of or access to Barton's confidential and proprietary, and trade-secret information, including without limitation Barton's *MSP & VMS Selling around them During Covid-19*, database information, Client information, Provider information, any and all Derived Information (as defined below), and any other documents and/or information of or relating to Barton, and to impose a constructive trust and/or disgorge to Barton any monies directly or indirectly derived from Defendants' misappropriation of Barton materials, and/or violation of all other common-law and/or statutory obligations;

      H.    Require AB Staffing to provide an accounting of, and to turn over to Barton, any and all information and data gleaned, learned, garnered, and/or derived directly or indirectly (collectively, "Derived Information") from AB Staffing's illicit use of or access to Barton's confidential and proprietary , and trade-secret information, including without limitation Barton's Provider curriculum vitae Trainor and Guaglianone took from Barton), and any other documents and/or information of or relating to Barton;

      I.    Require the Individual Defendants to pay Barton's costs and fees under A.R.S. §§ 12-341 and 12-341.01 arising out of the Employee Defendants' breaches of their contractual confidentiality and Return of Documents obligations in their respective Barton Employment Agreements.

7225471v1(88888.920)

J.      Enjoin Employee Defendants and AB Staffing from directly or indirectly accessing and using any such Derived Information; and

K.      Grant Barton such other and further relief as the Court deems appropriate.

## VI.    JURY DEMAND

Barton claims its right to a trial by jury on all issues and claims so triable.

RESPECTFULLY SUBMITTED this 5th day of August 2020.

JENNINGS, STROUSS & SALMON, P.L.C.

By s/ Julia S. Acken
    John J. Balitis
    Julia S. Acken
    One East Washington Street, Suite 1900
    Phoenix, Arizona  85004-2554
    *Attorneys for Plaintiff*

7225471v1(88888.920)